UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RENARD MONTEZ AUSTIN, et al.,

        Plaintiffs,                    Case No. 20-12938

v.

                                  HON. MARK A. GOLDSMITH

MICHAEL MOSLEY, et al.,

        Defendants.

_____/

**OPINION & ORDER**
**GRANTING DEFENDANT CITY OF DETROIT'S MOTION FOR SUMMARY**
**JUDGMENT (Dkt. 55)**

This matter is before the Court on Defendant City of Detroit's motion for summary judgment

(Dkt. 55).  For the reasons that follow, the Court grants the motion.[1]

### I. BACKGROUND

Plaintiffs Renard Montez Austin and Ursula Cook bring this 42 U.S.C. § 1983 action against

Defendants Michael Mosley, a former police officer with the Detroit Police Department (DPD),

and the City of Detroit.  Compl. (Dkt. 1).  This action arises out of Mosley's alleged falsification

of information in a search warrant affidavit and the subsequent search, arrest, and detention of

Plaintiffs.

#### A.  Affidavit and Subsequent Search, Arrest, and Detention

Plaintiffs allege that, on October 3, 2018, Mosley falsified and swore to an affidavit to secure

a search warrant for Cook's home and that this falsified affidavit and resulting search led to

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided
based on the parties' briefing.  See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).  In addition to
the motion, the briefing includes Plaintiffs' response (Dkt. 65).

Plaintiffs' unlawful arrest and detention.  Id. ¶¶ 7–12.  They allege that Mosley made several false statements in the affidavit, including that he had received information from a confidential informant that drugs were being stored and sold at the address, that he surveilled the address, and that he observed two individuals engaging in a suspected drug transaction with buyers at the address.  Id. ¶¶ 9–10.  Further, they allege that Mosley falsely stated in the affidavit that, based on his 18 and a half years of experience as a police officer and eight years in the narcotics unit, he believed there was probable cause that drugs and the individual suspected of making the drug transaction would be found at the address to be searched.  Id.  ¶ 11.  Mosley presented the affidavit to a magistrate in Michigan's 36th District Court, and the magistrate issued a search warrant based on the facts presented.  Search Warrant Packet (Dkt. 55-3).  Plaintiffs assert that the search of Cook's home led to their unlawful arrest, detention, and prosecution for drug and felony firearm crimes.  Compl. ¶ 14–15.

As to the criminal charges against Plaintiffs resulting from the search, Austin pleaded guilty, but he appealed and had his sentence and plea vacated due to Mosley's criminal conduct in another case in this district.  Id. ¶¶ 15, 25.  Cook was found not guilty after a bench trial held in February 2019.  Id. ¶¶ 15, 18.

**B.  Mosley's History with DPD**

Mosley was a member of DPD's narcotics unit from 2008 to about 2012.  Mosley Dep. at 12, 24 (Dkt. 65-1).  After about one year spent in another unit at DPD, Mosley transferred to the major violators unit (MVU)—an iteration of the narcotics unit—around 2013 or 2014.  Id. at 19, 24. Mosley remained in MVU until he resigned from DPD under charges in August 2019.  Id. at 24; Mosley Resignation/Retirement Notification (Dkt. 55-7).

On August 22, 2019, Mosley was indicted in this district and charged with two counts of federal program bribery. United States v. Mosley, No. 19-cr-20548 (E.D. Mich. 2019) (No. 19-cr-20548, Dkt. 1). According to the indictment, Mosley accepted cash bribes from an alleged drug trafficker while he was a member of MVU. Id. Mosley pleaded guilty and was sentenced to 18 months of imprisonment (No. 19-cr-20548, Dkts. 14, 25).

### C. DPD's Narcotics Unit and FBI Investigations

In addition to Mosley, other DPD officers in the narcotics unit engaged in criminal conduct. In 2014, the FBI informed DPD that it was investigating multiple members of the narcotics unit for corruption. Operation Clean Sweep Report at 171–172 (Dkt. 65-2). Two officers were indicted for arranging drug transactions and then robbing and extorting the participants of controlled substances, money, and personal property. Id. at 96; Indictments (Dkt. 65-3). After a jury trial, the officers were found guilty of conspiracy to obtain property by extortion. United States v. Hansberry, Case No. 15-cr-20217 (E.D. Mich. 2015). Another officer pleaded guilty to conspiracy to distribute cocaine. United States v. Leavells, Case No. 15-cr-20217 (E.D. Mich. 2015). Due to the FBI investigation, in 2014, the chief of police disbanded the narcotics unit, reassigned its personnel, and created MVU. Operation Clean Sweep Report at 171.

In April 2019, the FBI conducted another corruption investigation after receiving a tip from a narcotics dealer who alleged that Mosley attempted to coerce money from him in exchange for ensuring he would not be prosecuted after a narcotics raid on his house. Id. at 7. The FBI informed DPD of the allegations and the investigation. Id. In May 2019, the FBI observed Mosley collecting a bribe from the narcotics dealer, which led to Mosley's indictment in this district. Id. at 9.

On August 22, 2019, the chief of police ordered an investigation of the narcotics unit/MVU. Id. at 7. He established a DPD-led multi-agency task force, the Operation Clean Sweep Task Force

(OCSTF), to identify evidence of criminality or departmental misconduct.  Id.  OCSTF reviewed all records pertaining to narcotics investigations from 2009 through 2019.  Id.  DPD produced a report on OCSTF's findings, which was published in November 2021.  See id.  According to the report, OCSTF found that DPD officers engaged in misconduct that included falsifying information in affidavits in support of search warrants, releasing felony offenders without authorization, submitting forged court documents, and committing overtime and source-of-information fraud.  Id. at 203–204.  Christopher Graveline, who was the director of DPD's Professional Standards Bureau and Constitutional Policing and who helped lead the investigation into the narcotics unit, reported that OCSTF referred several members of MVU for criminal prosecution for time fraud.  Graveline Dep. at 7–8, 29–30, 47, 51 (Dkt. 65-5).  Graveline stated that "[t]he one outlier who was not referred for time fraud" was an officer who was referred for perjury in search warrant affidavits and on the witness stand.  Id. at 51, 64–65.

### D. Plaintiffs' Claims

Plaintiffs allege that Mosley's falsification of the affidavit in support of the search warrant violated their Fourth, Eighth, and Fourteenth Amendment rights.  See Compl. ¶ 34.  They bring a Monell claim against the City.  Id. ¶¶ 32–41.  They offer two theories for holding the City liable. First, the City had a policy of inadequate training and supervision.  Id. ¶¶ 37–39; Resp. at 19–20. Second, the City had a custom of tolerating or acquiescing to constitutional violations.  Compl. ¶¶ 35–36; Resp. at 19–20.  Plaintiffs assert that the inadequate training and supervision and custom of tolerance were the moving force behind their unconstitutional search, arrest, and detention—all of which were caused by Mosley's false affidavit.  Compl. ¶ 39; Resp. at 2, 22.

The City filed a motion for summary judgment.  It does not challenge Plaintiffs' allegations that their constitutional rights were violated.  Rather, it asserts that there is no municipal liability. Mot. at 6–10.

## II. ANALYSIS[2]

Section 1983 provides a cause of action against a "person who . . . causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  "A municipality is a 'person' under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible."  Morgan v. Fairfield Cnty., 903 F.3d 553, 565 (6th Cir. 2018). "A municipality may not be held liable under § 1983 on a respondeat superior theory—in other words, 'solely because it employs a tortfeasor.'"  D'Ambrosio v. Marino, 747 F.3d 378, 388–389 (6th Cir. 2014) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)).  Instead, a plaintiff must show that "through its deliberate conduct, the municipality was the moving force behind the injury alleged."  Alman v. Reed, 703 F.3d 887, 903 (6th Cir. 2013) (punctuation modified).  "A plaintiff does this by showing that the municipality had a 'policy or custom' that caused the violation of [his or her] rights."  Wright v. City of Euclid, Ohio, 962 F.3d 852, 880 (6th Cir. 2020) (quoting Monell, 436 U.S. at 694); see also Brawner v. Scott Cnty., Tenn., 14 F.4th 585, 598 (6th Cir. 2021) (explaining that, to present a jury question on municipal liability, the

---

[2] In assessing whether Defendants are entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

plaintiff must present evidence that would allow a reasonable jury to find that the municipality's policies caused the constitutional harm).

When a plaintiff alleges that a constitutional violation arises from the execution of a policy or custom, the plaintiff must "(1) identify the policy, (2) connect the policy to the entity, and (3) show that the particular injury was incurred because of the execution of that policy." Brawner, 14 F.4th at 598 (punctuation modified). Therefore, to attach liability to a municipality, a plaintiff must show "a direct causal connection between the policies or customs of the city and [his or her] constitutional injury." Gray v. City of Detroit, 399 F.3d 612, 617 (6th Cir. 2005).

A plaintiff can show that a municipality had a policy or custom that caused his or her constitutional injury in four ways. Jackson v. City of Cleveland, 925 F.3d 793, 828 (6th Cir. 2019). The plaintiff may prove: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." Id. (punctuation modified).

The City argues that there is no evidence that any City policy or custom was the moving force behind the violation of Plaintiffs' constitutional rights, and, therefore, it is entitled to judgment as a matter of law. Mot. at 6–10. Plaintiffs, however, contend that there are genuine factual disputes related to both the third and fourth methods of establishing municipal liability. Resp. at 19.

The Court discusses each theory of liability in turn.

### A.  Policy of Inadequate Training or Supervision

One way to prove an unlawful policy or custom is to show a policy of inadequate training or supervision. Ellis v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006); see also Gregory v. City of Louisville, 444 F.3d 725, 753 (6th Cir. 2006) (explaining that courts recognize

a systematic failure to adequately train police officers as a custom or policy that can lead to municipal liability). "To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." Ellis, 455 F.3d at 700.

The Court first considers Plaintiffs' failure-to-train theory, and it then turns to Plaintiffs' failure-to-supervise theory.

### 1. Failure to Train

### a. Adequacy of Training

For Plaintiffs to survive summary judgment on their failure-to-train theory, there must be sufficient evidence to create a factual dispute as to whether the City's training was inadequate for the tasks performed. Id. While Plaintiffs do not specify in what particular area or on what particular topic the City failed to adequately train officers such as Mosley, it appears that the relevant task performed, and the task that forms the basis of Plaintiffs' claim against the City, is completing a truthful affidavit in support of a search warrant. See Compl. ¶ 34; see also Resp. at 20.

It is not Defendants' burden to show that the training was adequate, but, rather, Plaintiffs' burden to show that the training was inadequate. See Harvey v. Campbell Cnty, 453 F. App'x 557, 566 (6th Cir. 2011) (explaining that plaintiffs are "obligated to come forward with affirmative evidence above and beyond the pleadings to show that the training [a law enforcement officer] received was not sufficient"); Mosier v. Evans, No. 1:20-cv-02197, 2023 WL 2074320, at *11 (W.D. Tenn. Feb. 17, 2023). The Court finds that Plaintiffs have not met this burden.

Plaintiffs rely on Mosley's testimony about the training that he received as a DPD officer. After he was accepted to become a member of the narcotics unit, he received specialized training, which consisted of participation in undercover school.  Mosley Dep. at 14.  In undercover school, which lasted about two weeks, he was trained on undercover techniques, such as how to trail and follow someone, "court procedures," and "search warrants."  Id. at 15.  Mosley did not provide additional detail on what training on "court procedures" and "search warrants" involved.  In response to the question, "And do you remember what initially you were trained on in terms of what you need to include in an affidavit?", Mosley stated, "Just probable cause, trying to get probable cause as far as to get the affidavit."  Id. at 16.  He was not trained on any particular formula or method to obtain probable cause but rather followed the lead of senior officers.  Id. at 16–17.  He also received on-the-job training.  Id. at 17.  In addition, Mosley testified that he was trained not to violate anyone's constitutional rights and that he was trained to tell the truth.  Id. at 107, 110, 111.  Mosley did not receive a DPD manual or the narcotics unit's standard operating procedures (SOPs), but he was trained on the general regulations and policies of DPD that were contained within the manual.  Id. at 108.  He was employed with DPD for approximately 19 years, and he served within the narcotics unit and later MVU for approximately nine years.  Id. at 9, 19, 24.

The Court finds that these specific facts, which provide only minimal information on the particulars of the training that Mosley or other officers received regarding making statements in an affidavit, are insufficient to demonstrate a triable issue that the City inadequately trained its officers in this area.  Plaintiffs do not expressly connect the alleged inadequacy of the training described above to the specific task of preparing and swearing truthfully to an affidavit.  See Gorney v. Charter Twp. of Brownstone, No. 14-12731, 2016 WL 4537828, at *12 (E.D. Mich.

Aug. 31, 2016) (finding that plaintiffs had not produced sufficient evidence of inadequate training of defendant officers when they failed to challenge evidence indicating that the officers' training and experience was adequate and when they offered no analysis regarding the sufficiency of the officers' training in the particular area that was the focus of the constitutional violation). Plaintiffs also do not point to evidence suggesting that the City did not train or inadequately trained its officers that it is illegal to search a residence or individual based on false information, nor do they point to evidence suggesting that the City did not train or inadequately trained its officers not to include or rely on false information in search warrant affidavits. In fact, Mosley testified that he was trained to tell the truth, Mosley Dep. at 107, 110, which directly contradicts Plaintiffs' theory that the City's training was a causal factor in Mosley's alleged misrepresentations in the warrant. See Raggs v. Pittsfield Charter Twp., No. 14-13946, 2016 WL 3626807, at *12 (E.D. Mich. July 7, 2016) (finding that plaintiff could not prevail on failure-to-train theory when defendant officer testified that he received training on the particular task that was the focus of plaintiff's claim and behaved in a way that was contrary to that training).

Plaintiffs cite statements from the OCSTF report to demonstrate inadequate training. They point to the report's finding that, while DPD had written guidelines and protocols explaining how it expected the narcotics unit's mission to be accomplished, several MVU officers stated that they had not received a copy of the narcotics unit's SOPs. Resp. at 7 (citing Operation Clean Sweep Report at 132–133). In Plaintiffs' view, this apparent oversight is consistent with Mosley's testimony that he did not receive a copy of the narcotics unit's SOPs. These supposed deficiencies, however, say nothing about inadequate training regarding officers' need to tell the truth or to seek warrants only when they believe the facts amount to probable cause. Plaintiffs fail to connect

DPD's supposed failure to distribute policy documents to the specific "tasks" they challenge.  See Ellis, 455 F.3d at 700.

In addition, Plaintiffs note that, following the indictment of DPD officers for extortion in 2015, "[t]here were no new procedures, protocols, or training put into place."  Resp. at 8.  However, the mere fact that DPD did not update its policy documents does not add anything to Plaintiffs' argument where they have failed to establish that either the original training or the new training related to the challenged tasks.[3]

Therefore, Plaintiffs have not demonstrated a triable issue that training on affidavits was inadequate.  Further, even if there were sufficient evidence to create a factual dispute as to the adequacy of training, there is not sufficient evidence to create a factual dispute that the City maintained its inadequate training out of deliberate indifference, as discussed below.

**b. Deliberate Indifference**

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  Connick v. Thompson, 563 U.S. 51, 61 (2011).  Inadequate police training may serve as the basis for § 1983 liability "'only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact.'"  Ouza v. City of Dearborn Heights, Mich., 969 F.3d 265, 287 (6th Cir. 2020) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)).  "Deliberate indifference is a stringent standard of fault,

_____

[3] Plaintiffs assert that Mosley violated their constitutional rights, which the City does not seem to challenge.  However, a constitutional violation alone is insufficient to hold the City liable.  "[T]he factfinder's inferences of inadequate training and causation [must] be based on more than the mere fact that the misconduct occurred in the first place."  Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 130 (2d Cir. 2004); see also Miller v. Calhoun Cnty., 408 F.3d 803, 816 (6th Cir. 2005) (affirming summary judgment for defendant on failure-to-train claim because plaintiff failed to offer "evidence beyond the facts of this case tending to show that the [municipality's] training and staffing policies were inadequate").

requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick, 563 U.S. at 61 (punctuation modified).

There are two ways to support a claim that a failure to train is the result of a municipality's deliberate indifference. Cherrington v. Skeeter, 344 F.3d 631, 646 (6th Cir. 2003). The plaintiff may show either (i) a "pattern of similar constitutional violations by untrained employees" or (ii) "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." Shadrick v. Hopkins Cnty., 805 F.3d 724, 738–739 (6th Cir. 2015).

Plaintiffs seem to base their municipal liability claim on the first type of deliberate indifference. See Resp. at 19–21. Under this approach, a plaintiff must show that the defendant was aware of "prior instances of unconstitutional conduct" such that it "was clearly on notice that the training in this particular area was deficient and likely to cause injury" and yet "ignored a history of abuse." Ouza, 969 F.3d at 287 (punctuation modified). Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to demonstrate deliberate indifference. Harvey, 453 F. App'x at 563.

The Operation Clean Sweep report—which is based on a review of narcotics investigations from 2009 to 2019 and, therefore, encompasses the time period of Plaintiffs' search and arrest in 2018—found that DPD officers falsified information in search warrant affidavits and lied about the reliability of confidential informants or about conducting surveillance. Operation Clean Sweep Report at 203–204. The report states that OCSTF identified "multiple search warrant affidavits containing false information." Id. at 204. It does not specify when these affidavits were falsified or how many officers engaged in this conduct, either as an absolute number or as a percentage of all DPD officers. The report does state that "approximately a dozen MVU officers" intentionally

and purposely engaged in misconduct. Id. at 203. It is not clear if all of these officers engaged in the specific misconduct of falsifying affidavits. See Yatsko v. Graziolli, Nos. 20-3574/3576/3643, 2021 WL 5772527, at *6 (6th Cir. Dec. 6, 2021) (finding that plaintiff could not prove a city's deliberate indifference to constitutional violations based on a report when the report identified a few instances of unconstitutional conduct but did not establish an "ongoing issue" of the conduct that was the basis of plaintiff's claim).

Even if this investigative unit did eventually uncover these issues and even if this finding from the report does indicate a pattern of similar unconstitutional conduct, this fact does not mean that the City was "on notice" of the violations. The OCSTF report was published in 2021—after Plaintiffs experienced their alleged constitutional injury in 2018. Plaintiffs do not argue that the City knew of this fact from the OCSTF report before Plaintiffs experienced their alleged constitutional injury. In fact, Plaintiffs suggest that DPD did not know of its officers' wrongdoing, stating that "the evidence in this case shows that in 2014, the FBI knew that Mosley was a part of a corrupt and criminal unit within the DPD, yet the DPD, despite its superior access to information regarding its own officers, was allegedly in the dark." Resp. at 13. Similarly, they assert that, in 2018, "it once again took the FBI to inform the DPD that the corruption and criminality never went away." Id.

Plaintiffs point to other evidence in support of deliberate indifference, but, for multiple reasons, this evidence likewise does not indicate that the City was aware of instances of falsified affidavits such that it had notice that training in this area was deficient, but disregarded this deficiency and potential for injury.

As evidence of prior instances of unconstitutional conduct, Plaintiffs point to the 2014 FBI investigation, the subsequent conviction of DPD officers, and the 2019 FBI investigation of

Mosley, which in turn prompted the Operation Clean Sweep investigation and the criminal referral of several members of MVU.  See Resp. at 13.  The DPD officers who were investigated by the FBI in 2014 and who were later indicted, however, engaged in extortion, robbery, and conspiracy to distribute a controlled substance.  There is no evidence that, due to the first FBI investigation, officers were investigated or indicted for unconstitutional conduct similar to the conduct here— making false statements in a search warrant affidavit.  See Lopez v. Foerster, No. 20-2258, 2022 WL 910575, at *8 (6th Cir. March 29, 2022) (finding that plaintiff could not establish deliberate indifference based on a pattern when a prior incident was not similar to the alleged constitutional violation plaintiff experienced); Miller, 408 F.3d at 815–816 (finding that without evidence of similar constitutional violations, the plaintiff could not show deliberate indifference because the county was not on notice of the danger of those violations); Anderson v. Jones, 440 F.Supp.3d 819, 838 (S.D. Ohio 2020) (explaining that, for a pattern of unconstitutional conduct to exist, "there must be a frequently recurring constitutional violation of a similar nature in advance of the violation at issue").

The 2019 FBI investigation, together with the subsequent Operation Clean Sweep investigation and criminal referral of officers in MVU, all occurred after the search of Cook's home and after Plaintiffs' arrest and detention—that is, after the constitutional violations that form the basis of Plaintiffs' claim against the City.  Therefore, Plaintiffs cannot rely on these events to establish "prior instances of unconstitutional conduct" demonstrating that the City was on notice that training related to affidavits was deficient and likely to cause injury.  See Fisher v. Harden, 398 F.3d 837, 849 (6th Cir. 2005); Wright, 962 F.3d at 881 (explaining that certain instances of excessive force could not establish that a police department had a track record of excessive force at the time of plaintiff's constitutional injury because these instances occurred after plaintiff's

constitutional injury); <u>Waller v. City and Cnty. of Denver</u>, 932 F.3d 1277, 1286–1287 (10th Cir. 2019) (stating that "[i]ncidents that occurred subsequent to the incident at issue in this case cannot have provided [the municipality] with notice of a deficiency in its training program before that incident" and, therefore, could not be used as evidence that the municipality acted with deliberate indifference in failing to train). As a result of the Operation Clean Sweep investigation, one officer was referred for prosecution and terminated due to falsifying information in an affidavit. Graveline Dep. at 51, 64–65. But nothing suggests that the City had notice of this conduct at the time of Plaintiffs' alleged constitutional injury.

Plaintiffs also contend that the City's deliberate indifference is evident in the lack of policy changes when the narcotics unit transitioned to MVU. Resp. at 19–21. But Plaintiffs do not identify what the original policy regarding the warrant process was, so it is not clear how a failure to institute a change in policy would relate to the warrant process or demonstrate deliberate indifference to inadequate training. <u>See Harvey</u>, 453 F. App'x at 568 (explaining that one cannot draw inferences of inadequate training or deliberate indifference from the mere fact that, given the training an officer had, the officer still committed a constitutional violation). Plaintiffs do not describe how exactly the City inadequately trained its officers in a manner that caused the harm they suffered. <u>See Siler v. Webber</u>, 443 F. App'x 50, 55 (6th Cir. 2011) (explaining that to prove deliberate indifference, "a plaintiff must offer evidence of a pattern of constitutional violations attributable to training shortcomings").

In addition, Plaintiffs argue that the City's deliberate indifference is seen in the fact that MVU recruited and hired officers from the narcotics unit. Resp. at 20–21. The OCSTF report stated that MVU did so as "a quick fix to the inexperience and lowered production problems" that occurred during the transition from the narcotics unit to MVU. Operation Clean Sweep Report at 171–172.

14

Plaintiffs argue that this staffing of MVU with former narcotics unit officers shows that the City "very quickly undermined any effort to root out corruption and criminality when it essentially reformed the Narcotics Unit under a different name." Resp. at 21. They argue that a reasonable factfinder could conclude that the City undertook this reorganization "because it simply did not care whether its officers were violating the rights of its citizens, which is why the FBI was forced to intervene twice in a short period of years." Id. This conclusion, however, is not supported by the evidence. As noted, there is no evidence indicating that the City knew of a pattern of falsification of affidavits (or wrongful searches or false arrests) by DPD officers before the Operation Clean Sweep Report was published in 2021, which is after the conduct that forms the basis of Plaintiffs' alleged constitutional injuries. Therefore, there are no facts suggesting that the lack of policy changes or staffing of MVU was the result of a "conscious choice," rather than mere negligence. See City of Canton, 489 U.S. at 389.[4]

Therefore, the evidence for Plaintiffs' failure-to-train theory of municipal liability does not meet the stringent standard of deliberate indifference. Plaintiffs have not demonstrated a triable issue that the City knew and knowingly disregarded the fact that its training on the need to state accurate facts in search warrants was "deficient and likely to cause injury." Ouza, 969 F.3d at 287 (punctuation modified).

---

[4] To the extent Plaintiffs intend to rely on the second method of establishing deliberate indifference, in which they may prove "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation," they cannot survive summary judgment. Shadrick, 805 F.3d at 738–739. There is no evidence that the City failed to train its employees on affidavits or search warrants. Mosley testified that he was trained in both of these areas. See Mosley Dep. at 15, 16–17.

### c. Causation

Plaintiffs have also failed to establish a triable issue that the City's deliberate indifference resulted in training so inadequate that the inadequate training caused their constitutional injury. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Bd. of County Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 405 (1997).  To satisfy this standard of causation, a plaintiff must show a "direct causal link" between the municipality's policy or custom and the constitutional violation.  Powers v. Hamilton Cnty. Pub. Def. Comm'n, 501 F.3d 592, 607 (6th Cir. 2007).

Here, the evidence does not support an affirmative link between the City's lack of training and the search, arrest, and detention of Plaintiffs based on Mosley's affidavit.  Plaintiffs do not point to evidence that shows how, if Mosley had received additional or different training, the training would have prevented Mosley's falsification of the affidavit and the subsequent search, arrest, and detention.  See City of Canton, 489 U.S. at 391 (explaining that the causation inquiry focuses on whether "the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect").  While they assert that a policy of inadequate training was the moving force behind the constitutional violations, they have not "spelled out . . . [their] theory regarding a crucial question in the causation chain: 'Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?'"  Carey v. Helton, 70 F. App'x 291, 294–295 (6th Cir. 2003) (quoting City of Canton, 489 U.S. at 391)).  "This deficiency alone would establish a sufficient basis for the entry of summary judgment in favor of the defendants."  Id.

In addition, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." <u>City of Canton</u>, 489 U.S. at 390–391.  Plaintiffs have not provided evidence that would tend to rule out alternate causes of the search, arrest, and detention based on Mosley's false affidavit, such as "the negligent administration of a valid program, or one or more officers' negligent or intentional disregard of their training." <u>Amnesty</u>, 361 F.3d at 130 (explaining that a plaintiff cannot prevail on a failure-to-train claim without evidence as to how particular training was conducted, "how better or different training could have prevented the challenged conduct, or how a hypothetically well-trained officer would have acted under the circumstances") (punctuation modified).  As noted, Mosley testified that he was trained to tell the truth.  Mosley Dep. at 115, 117.  Therefore, "if he engaged in the conduct that [Plaintiffs] describe," which the City does not seem to challenge, "it would not have been due to the absence of training.  It would have been due to the intentional disregard of that training." <u>Gambrel v. Knox Cnty., Ky.</u>, 25 F.4th 391, 410 (6th Cir. 2022) (punctuation modified).

The United States Court of Appeals for the Sixth Circuit has suggested that, when employees engage in "blatant wrongdoing," the deliberate indifference and causation elements "regularly foreclose failure-to-train claims against municipalities." <u>Id.</u>  It has endorsed the reasoning of other circuits, examining facts in which the inappropriateness of an employee's wrongdoing is "self-evident," which have held that "since the employees knew or at least should have known that their conduct was wrongful (and even criminal) . . . a lack of training did not 'cause' the conduct[,] and additional training would not have prevented it." <u>Id.</u> at 410–411.  Given Mosley's testimony, and the lack of evidence affirmatively linking inadequate training to Plaintiffs' constitutional injury,

this conclusion applies here.  Plaintiffs have not shown that the cause of their injuries was the City's improper training rather than Mosley's own undisputed "blatant wrongdoing."

Because there is insufficient evidence from which a jury could conclude that the City's training was inadequate, that the inadequacy was caused by the City's deliberate indifference, or that the inadequacy caused the search, arrest, or detention of Plaintiffs, Plaintiffs cannot establish municipal liability based on failure to train.

### 2. Failure to Supervise

In addition to arguing that the City had a policy of inadequate training, Plaintiffs argue that it had a policy of inadequate supervision because supervisors did not review and substantiate the search warrant affidavits that DPD officers prepared.  Resp. at 20; see also Mosley Dep. at 17–18, 28 (stating that, during Mosley's career with DPD, submitting search warrant affidavits to a supervisor for review before presenting them to a judge "was never a common practice").

 Like the failure-to-train theory, the failure-to-supervise theory "must meet the rigorous standards of culpability and causation that the Supreme Court has required when a plaintiff claims that a municipality has indirectly caused a violation of federal rights in spite of its facially lawful policies."  Amerson v. Waterford Twp., 562 F. App'x 484, 491–492 (6th Cir. 2014) (punctuation modified); see also Mize v. Tedford, 375 F. App'x 497, 500 (6th Cir. 2010) (noting that a failure-to-supervise claim that is distinct from a failure-to-train claim is uncommon but that, however characterized, a failure-to-supervise claim must meet the deliberate indifference and causation standards).

To succeed on a failure-to-supervise theory, therefore, the Plaintiffs must prove that (i) supervision in a particular area was inadequate; (ii) the City was deliberately indifferent to the known or obvious constitutional violations that would result from the inadequate supervision; and

(iii) the City's inadequate supervision was the moving force behind the unconstitutional conduct. <u>Pesci v. City of Niles</u>, 674 F. App'x 544, 547 (6th Cir. 2017).

### a. Adequacy of Supervision

The OCSTF report identified "inadequate overall supervision" and "lack of search warrant and surveillance supervisory oversight" as "areas of concern."  OCSTF Report at 205.  Thus, a reasonable jury could conclude that supervisory review of search warrant affidavits was inadequate.  As with their failure-to-train theory, however, Plaintiffs have not created a genuine factual dispute as to the deliberate indifference and causation elements.

### b. Deliberate Indifference

In support of deliberate indifference, Plaintiffs point to (i) the lack of "increased supervision" after the conviction of three officers in the narcotics unit in 2015, despite the City's familiarity with criminality during narcotics raids, and (ii) the fact that MVU recruited and returned officers from the narcotics unit.  Resp. at 19–21.  They contend that because supervisors did not review and substantiate affidavits, "[c]orrupt officers like Mosley knew they had the ability to unilaterally decide to raid a home with no oversight from supervisors to ensure there was probable cause."  <u>Id.</u> at 20.  Therefore, they state, "when Mosley fabricated the search warrant affidavit in this case prior to illegally raiding Plaintiffs' home, there was no safeguard in place to protect Plaintiffs' rights." <u>Id.</u>

However, for the same reasons that Plaintiffs have not come forward with sufficient evidence to support a finding that a failure to train amounted to deliberate indifference, they have failed to show there is sufficient evidence to conclude that the City was on notice that supervisors' failure to review and substantiate affidavits was likely to cause injury and yet ignored this risk.  The 2014 FBI investigation and subsequent conviction of DPD officers involved officers who engaged in

extortion and drug crimes.  There is no evidence indicating that the falsification of affidavits was involved in these events, or that these events would have demonstrated to the City that supervision regarding search warrant affidavits was deficient.  The City's notice of inadequate supervisory review of affidavits also cannot be inferred from the recruitment and return of narcotics unit officers to MVU.  And, as noted, the OCSTF report that (i) identified falsified affidavits and (ii) deemed the lack of search warrant supervisory oversight an "are[a] of concern" was published after Plaintiffs experienced their alleged constitutional injury, and there is no evidence that the City knew of the findings in the report before their injury.  See Amerson, 562 F. App'x at 492 (finding that plaintiff's evidence that municipality failed to monitor the performance of its employees was not enough to show deliberate indifference and that, to support his failure-to-supervise claim, plaintiff needed to present evidence of a pattern of similar constitutional violations, a record of officers going unpunished for similar constitutional violations, or other circumstances showing that the municipality was aware that a particular officer was prone to engage in those constitutional violations).[5]

### c. Causation

Plaintiffs have not created a triable issue that the lack of supervisory review was the moving force behind the wrongful search, arrest, or detention in this case.  There is no evidence suggesting that, if a supervisor reviewed and substantiated Mosley's affidavit, Plaintiffs' constitutional injury would have been avoided.

---

[5] Plaintiffs have not shown they can demonstrate deliberate indifference through the single incident theory of liability because they do not argue that it is obvious that the failure of Mosley's supervisors to review and substantiate information in the affidavits that Mosley prepared would lead to the constitutional violation.  See Bryan Cnty., 520 U.S. at 409.

Because there is insufficient evidence from which a jury could conclude either that the City maintained a policy in which supervisors did not review affidavits out of deliberate indifference to the constitutional violations that may occur as a result or that the lack of supervision caused the search, arrest, and detention of Plaintiffs, Plaintiffs cannot meet the "rigorous standards of culpability and causation" required to establish municipal liability based on failure to supervise. Brown, 520 U.S. at 405.

### B. Custom of Tolerance or Acquiescence of Federal Rights Violations

A plaintiff may also hold a municipality liable on the basis of a "custom of tolerance or acquiescence of federal rights violations." Jackson, 925 F.3d at 828. Under this theory, "a policy of tolerating federal rights violations is unwritten but nevertheless entrenched." Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005) (identifying this method of establishing the existence of an illegal policy or custom as the "inaction theory"). To prevail under this theory, the plaintiff must show the following:

> (1) the existence of a clear and persistent pattern of [illegal activity]; (2) notice or constructive notice on the part of the [defendant]; (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [defendant's] custom was the 'moving force' or direct causal link in the constitutional deprivation.

Id. (punctuation modified). Thus, a custom-of-tolerance claim requires a showing that there was a pattern of inadequately investigating similar claims. Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013). Plaintiffs bear a "heavy burden in proving municipal liability" and "cannot rely solely on a single instance to infer a policy of deliberate indifference." Thomas, 398 F.3d at 433.

Plaintiffs seem to argue that the City had a custom of tolerating or acquiescing to constitutional violations generally. See Resp. at 21–22. They argue that each element is satisfied for the following reasons: the multiple FBI investigations and criminal prosecutions of DPD officers show

21

that DPD had a clear and persistent pattern of illegal activity; the City had notice because, as it has acknowledged, the FBI eventually told it about officers' crimes; and the City was deliberately indifferent to the illegal activity because it simply gave the narcotics unit a new name and failed to supervise the unit, allowing officers' criminal conduct to persist.  Id.  Plaintiffs offer only a conclusory argument for the fourth element, stating that there are genuine factual disputes over whether a City policy, practice, or custom was the moving force behind the alleged constitutional violations.  See id.

The custom-of-tolerance theory, however, has the same inadequacies as the failure-to-train or failure-to-supervise theory.  Even if the 2014 FBI investigation or the OCSTF report's finding that officers had falsified search warrant affidavits indicate a clear and persistent pattern of illegal activity, for the reasons stated above, there is insufficient evidence to support a finding that, at the time of the search, arrest, or detention of Plaintiffs, the City had notice or constructive notice of DPD officers making false statements in affidavits; that it tacitly approved of or failed to investigate such conduct; and that its custom of tolerating this conduct directly caused the search, arrest, and detention.  See Arendale v. City of Memphis, 519 F.3d 587, 600 (6th Cir. 2008) (finding that plaintiff relying on a custom-of-tolerance theory of liability could not survive summary judgment when he did not present evidence showing that the municipality "consciously never acted when confronted with its employees' egregious and obviously unconstitutional conduct").

Because Plaintiffs have not created a genuine factual dispute as to a failure-to-train, failure-to-supervise, or custom-of-tolerance theory of municipal liability, there is no basis for holding the City liable, and the City is entitled to summary judgment.

## III. CONCLUSION

For the reasons set forth above, the Court grants Defendant the City of Detroit's motion for

summary judgment (Dkt. 55).

SO ORDERED.

Dated: March 29, 2023                         s/Mark A. Goldsmith
        Detroit, Michigan                     MARK A. GOLDSMITH
                                              United States District Judge